CASE No. 940.

BLACK v. CHILDS.

1. To sustain a plea of purchase *bona fide* without notice, three things are necessary : (1) that he has paid in full the purchase money ; (2) that he has the legal title, or the best right to it ; (3) that he purchased *bona fide* without notice.

2. Section 8 of the act of 1791 (7 *Stat.* 263,) forbidding certain officers from being interested in the purchase of property sold by them officially, was superseded and repealed as to commissioners in equity by section 6 of the master's act of 1840. 11 *Stat.* 108, 120.

3. It seems to be the settled conclusion from the authorities, that where a trustee to sell purchases at his own sale, the sale is not void, but will be set aside upon the application of any one interested, whether the sale was fair, and a full price obtained, or not.

4. Denial of notice "directly or indirectly," is denial of notice had by an agent.

5. The objection that a defence of purchaser for valuable consideration without notice is not sufficiently pleaded, should be taken by motion to make the answer more definite, or by demurrer.

6. Where circumstances are sufficient to put a party upon inquiry, he is

chargeable with constructive notice of every fact which such inquiry, properly conducted, will certainly disclose.

7. Where P. a commissioner in equity, at his own sale procured his friend F. to purchase the property sold, and F. was announced as the bidder, took titles in his own name, and executed to the commissioner the required bond and mortgage, and P. took control of the property, a subsequent purchaser for value from F., under negotiations had with P., (who claimed to act for F., and who as commissioner, received payment in full of such bond and mortgage before maturity) is not chargeable with notice of P.'s interest, or of the private arrangement between P. and F., at the commissioner's sale.

Before THOMSON, J., Richland, April, 1879.

This was an action commenced in 1869. The facts are fully stated in the opinion of this court. The Circuit decree, after stating the facts, concluded as follows:

What title passed by such sale? The answer is given by the act of assembly, " That  *  *  *  no master or commissioner in equity  *  *  *  shall be concerned or interested, directly or indirectly, in the purchase or acquisition of any property sold by them respectively by virtue of or in obedience to any process, execution or order of court or law; and if any such officer shall presume to be concerned or interested in any such purchase or acquisition,  *  *  the purchase made shall be utterly void and of no effect."

Against J. H. Pearson it is clear the plaintiffs could demand and have resale of the premises.

Here it may be urged that, though the sale be wholly void as to Pearson, yet it may be valid as to his vendees or alienees, that is, to L. D. Childs and associates. In other words, is the sale so wholly void, the defect so total, that no title will vest in Pearson or Fair, although the purchaser can plead that he purchased without notice and for a valuable consideration?

An obligation or other instrument of writing declared void by statute is as if it never had existence. What is void cannot be confirmed. The statute against gaming declares all securities given for a gaming consideration void. Our courts have held such notes, though negotiable, void in the hands of an innocent holder. This construction was given upon the force of the words

used in the statute. So our court has held a purchase at a sheriff's sale by a deputy sheriff, through or by a third party, would, under the act recited, fail to convey the estate of the heirs-at-law, who, it is said, were as much owners as before the sale.

L. D. Childs, however, alleges that J. H. Pearson was, as to himself and associates, unknown in the transaction. That their purchase was from S. Fair, who had complied with the terms of the sale. That they were ignorant of any understanding between J. H. Pearson and S. Fair. That their purchase rests upon papers which did not indicate ownership in Pearson or suggest inquiry; in short, that, in the fullest sense, they are purchasers for valuable consideration without notice.

Admitting this to be true as to Childs and associates, what shall be said of A. G. Baskin, the agent?

L. D. Childs states that he employed A. G. Baskin as his attorney to examine the title to the property; that he placed the whole matter in his hands. That he (Childs) had confidence in his judgment, and so expressed himself. Notice in such case to an agent is notice to the principal, and notice to a solicitor is actual notice to the client.

What notice, then, had A. G. Baskin of the transaction? As a matter of course, A. G. Baskin must have known the contents of the record, must have known the order of the court *directing* the sale and its terms, the credit given to the purchaser, and that the installments *fell* due successively on the first days of January, A. D. 1864, 1865 and 1866; that a bond and mortgage were given conforming to these terms of sale; the direction that the money was to be retained until the further order of the court; the possession of the lot by Pearson and his conduct like that of an owner, which, of itself, made inquiry necessary, and the transaction which anticipated the payment and surrendered the mortgage to perfect the title to Childs. These were circumstances and acts sufficient to give notice to a prudent man, suggesting inquiry and disclosing peril to a purchaser. In a sale for partition by order of court, in a certain sense the court is the vendor, but not without reference to the will of the heirs-at-law. The court collects this will and embodies it in an order. Thus declared, it expresses the will of the parties in interest, and which

the court itself will not change or alter without their consent or notice to them.

No such power is vested in the commissioner. A vendee of a title resting upon a commissioner's sale, who knows that in obtaining it the order of sale has been destroyed, *purchases* without the consent of the heirs-at-law. He alters the terms of sale and does not purchase as the heirs-at-law proposed.

The following are the conclusions of law of the court:

1. That the sale by the commissioner, Pearson, of lot "C" and the purchase thereof by S. Fair, are void transactions under the statute, and that no interest passed to L. D. Childs and his associates, under the conveyance by S. Fair.

2. That notice was given to L. D. Childs through his agent, A. G. Baskin, of facts and circumstances affecting the title before the purchase was completed, and that L. D. Childs and his associates are not *bona fide* purchasers without notice.

It is therefore ordered, adjudged and decreed:

1. That the sale of lot "C" by J. H. Pearson is invalid, and the deed of conveyance thereof to S. Fair transfers no interest; and that the deed of S. Fair to L. D. Childs and others is invalid and conveys no interest, and it is ordered that the said deeds be delivered up to the master to be canceled.

2. That it be referred to the master to *inquire* and report the time L. D. Childs and associates have been in possession of lot "C," and the value of the rents and profits or of the use and occupation, reserving to the defendants the question of liability therefor.

3. That the master call in by the usual practice the creditors of the estate of A. Brodie to present and prove their demands by a given day, and report the same to the court.

4. That it be referred to the master to report upon testimony who are the heirs-at-law and distributees of A. Brodie, deceased, who are entitled to an interest in his estate under the statute of distributions, and for this purpose may use testimony already taken in this case.

5. That parties have leave to apply for an order of sale of lot "C," described in the pleadings.

Defendants L. D. Childs, William Johnston and W. H. Willard, the purchasers, appealed to this court.

*Messrs. Pope & Haskell,* for appellants.

*Mr. J. P. Carroll,* contra.

A trustee to sell is by law disabled from purchasing the trust property. *Sugd. on V. & P.* 161–2; *Hill on Trustees* 159. Under act of 1791, § 8, (7 *Stat.* 263,) a commissioner could not purchase at his own sales; such purchase was a nullity, and prohibited under penalty. This section was not repealed by act of 1840. 11 *Stat.* 132, § 31. The penalty attached makes the purchase absolutely void. *Story on Agency,* § 240; 1 *Story's Eq. Jur.,* § 306; *Potter's Dwarris* 250–1. Defendants do not deny notice to their agent, Baskin. *Le Neve* v. *Le Neve,* 2 *Lead. Cas. in Eq.* 27; 2 *Sugd. on V. & P.* 1041. The facts led up to notice. Besides, Pearson was in possession. 19 *Ves.* 254; *Adams' Eq.* 158; 4 *Rich. Eq.* 114; *Spears' Eq.* 27. The facts show that Pearson was not acting as agent for Fair, but for himself. The money was not due, and the record of the case showed it; therefore the bond is still subsisting. 1 *Sugd. on V. & P.* 48; *Story on Agency,* § 98.

November 22d, 1880. The opinion of the court was delivered by

McGOWAN, A. J., Alexander Brodie died intestate in 1861, seized of real estate. Charles H. Black administered upon his estate. In 1862 proceedings were instituted in the then court of equity, in a case entitled *Charles H. Black* v. *James Black and others* to partition or sell the land of which the intestate died seized. The record in the case in some way got out of its proper place, and as we now have it is not complete. There is, however, an order of sale of Chancellor Inglis, bearing date June 21st, 1862, which directed the commissioner to sell the lands in January then next or some succeeding sales day, "upon the following terms to wit: so much cash as will pay the costs of these proceedings and the sale, and the balance upon a credit of one, two and

three years, with interest from the day of sale, payable annually, secured by bond and personal security and a mortgage of the premises. After paying the costs that the commissioner retain the residue subject to the future order of the court."

John H. Pearson was at that time commissioner for Richland county, and on February 2d, 1863, he offered for sale the different parcels of land, and among them a lot marked " C," described as containing two acres and a fraction, which was bid off by Simeon Fair for $5075. The sale was in accordance with the order; was open, fair and for full value. The purchaser complied with the terms of sale, received titles from the commissioner, and executed to him bond and mortgage to secure the purchase money. From what remains of the record, it does not appear that this sale was confirmed by the court or that there ever was an order to pay out the proceeds of sale. Soon after the sale John H. Pearson went into possession of the lot and retained it until, in the same year, he contracted to sell it to Childs & Co., for $13,000 cash. The negotiation was conducted entirely by Childs and Pearson, and the latter told the former that the title was in Simeon Fair. Childs employed A. G. Baskin, Esq., to examine the titles, and he and Pearson being in the commissioner's office, called Childs in and informed him that " papers were all ready." They offered to show him a bundle of papers to satisfy him that it was "all straight and right," but he declined, saying that if his attorney was satisfied, he was. Baskin handed the title of Fair to Childs, and he paid the purchase money in cash, and went into possession, and still retains it. Pearson died in 1864, and James R. Scott is the representative of his estate.

Some time after the war (1869) some of the plaintiffs, claiming to be heirs of Alexander Brodie, deceased, filed a bill against the defendants, Simeon Fair and the representative of Pearson, to set aside the sale; upon what ground, does not appear (the original record is not before us); and to that bill Simeon Fair, on August 16th, 1869, answered : " That said lot was bid off by him at the instance and for the benefit of John H. Pearson, and although he took title and complied with the terms of sale, it was for the benefit of John H. Pearson ; that afterwards on being informed

by the said Pearson that he had bargained the same to Childs & Co., this defendant made titles to them, they agreeing to pay the bond for the purchase money." After this disclosure (1872) the plaintiffs filed this amended complaint to have the sale of lot "C" *rescinded, vacated and annulled*, and that the purchasers account for rents and profits since they went into possession. Baskin, Fair and Childs are all now dead. The defence is, that the defendants are innocent purchasers, without notice of any defect in the title. The Circuit judge decided that the sale was absolutely void, and also that Childs had notice, if not in person, through his attorney, A. G. Baskin, of facts and circumstances affecting the title before the purchase was completed. Childs and his co-purchasers except to this decree, and appeal to this court.

It is too well settled to need citation of authority that a purchaser, *bona fide*, without notice of any defect in his title may stand upon the plea of purchaser. Equity does not disarm a purchaser, but assists him. But to sustain the plea three things are necessary :

1. That he has paid in full the purchase money.

2. That he has the legal title or the best right to it.

3. That he purchased *bona fide* without notice.

In this case, there is no doubt that the purchasers paid the purchase money. Have they the legal title? The defence is purely equitable and cannot avail against the legal title, which might be established at law. The defendants have a perfect chain of paper title ; but it is said that the sale by Pearson for his own benefit was absolutely void under section 8 of the act of 1791, (7 *Stat.* 263,) and that therefore they have no title upon which to rest their plea. That act declares that "no commissioner in equity [also other officers] shall be concerned or interested, directly or indirectly, in the purchase or acquisition of any property sold by him by virtue of, or in obedience to any process, execution, order of court or law; and if such officer shall presume to be concerned or interested in any such purchase or acquisition at any sale by him made, he shall, *on conviction thereof*, be deprived of his office, and the purchase so made shall be utterly void and of no effect."

In 1840, the legislature passed what is known as the commis-

sioner's act, the title of which is "to ascertain and define the powers, duties and liabilities of masters, commissioners and registers in equity, and to prescribe for the organization and regulation of their respective offices." This act purports to be a codification of all the laws upon the subject and does include other old provisions, but entirely omits the section above referred to in the act of 1791. The only provision which it contains upon the subject of sales by the commissioner is in section 6, " that masters and commissioners in equity shall make all sales ordered by the said court and execute conveyances thereto." 11 *Stat.* 108, 120.

It is contended that the act of 1840 was a collection in convenient form of the whole law upon the subject, and that by excluding the provision of 1791, it was thereby repealed so far as it related to commissioners in equity. It may throw some light upon this subject to make a brief reference to the history of the act of 1840. The records show that in 1837 the legislature passed "an act concerning district officers and their offices," (6 *Stat.* 577,) which required the attorney-general and Circuit solicitor to examine and report as to the condition of the district offices, clerk, sheriff, commissioner in equity, &c., &c. These officers made a report to the session of 1838, whereupon the legislature passed a *joint resolution* appointing the attorney-general and the Circuit solicitors "*special commissioners* to sit during the recess, and at the next session to report *a bill or bills* containing in a condensed form the various duties and liabilities as required of, and imposed upon, the several officers whose offices are enumerated, together with such *amendments, additions* or *alterations;* as, after a full and careful examination of statute law, rules and practice of the courts and judicial decisions, the attorney-general and Circuit solicitors shall deem necessary or expedient relative to said officers." *Resolutions* 1838, 128. The result of the labors of these able commissioners was reported in separate bills in relation to the different offices—sheriff, commissioner, &c. All of these bills passed the legislature in 1839 except the commissioner's act, which passed the next year (1840.) The same persons learned in the law who were charged with the preparation of the commissioner's act, also prepared that of the sheriff. In the latter (the sheriff's act) the penal provision of 1791 was in-

serted, but it was omitted in the commissioner's act. There were reasons for that provision in regard to the sheriff, which did not exist as to the commissioner, and we have no doubt that under the authority to make alterations, it was intentionally omitted in the act of 1840 for the purpose of effecting its repeal. It is not so clear that the exclusion of the provision of 1791 from the act and the insertion therein of only a simple power of sale, were the only appropriate means of accomplishing the purpose of repeal. But, considering the nature and object of the act of 1840, the intelligence of the commissioners who framed it, and the great improbability that they would insert so important a provision in one bill, and merely by accident omit it in another, we feel constrained to hold that the act of 1840 superseded and repealed so much of the act of 1791 as related to the duties and liabilities of commissioners in equity.

This view is incidentally supported by the decision of this court in the case of *McCelvey* v. *Thomson*, 7 *S. C.* 185. That was an action to set aside a sale of a commissioner upon the allegation that he was interested in the sale. The first purchaser had sold the land to innocent parties, who were also included in the proceedings. The principle upon which the relief was granted is not apparent, for there was no fraud, and the interest of the commissioner in the property sold was *acquired after the sale;* but, being granted, it is manifest that the court did not consider the sale as utterly void under the act of 1791, for they held the first purchaser and the commissioner to account only as trustees for the profits, and allowed the defence of innocent purchasers on the part of those who purchased without notice. Justice Wright in delivering the opinion of the court said: "The sale to Reed and Brown must stand. In addition to the reasons already given, they were *bona fide* purchasers for valuable consideration and not affected with notice of any equity on the part of McCelvey sufficient to overreach legal title." This is a distinct declaration that McCelvey had only an equity and that the legal title was in the purchasers, which could not possibly be upon the assumption that the sale by the commissioner was utterly void.

Assuming, then, that the provision in the act of 1791, in regard to sales made by commissioners in equity, cannot control this

case, as it did not control the above-stated case, yet the fact still remains that Pearson, the commissioner, by a private arrangement made in advance with a friend, purchased the lot in question. The commissioner was, in one sense, a trustee for the parties in interest; he was a trustee to sell, and indirectly purchased at his own sale. That sale must be tested by the equitable principles applicable in such cases. We shall not enter into the question, which has been much discussed in our courts, as to the exact status of such a sale, but accept what seems to be the settled conclusion from all the authorities, that whilst such a sale is not utterly void, it will be set aside on the application of any one interested, and that without reference to the question whether the sale was fairly conducted or whether a full and fair price was paid. *Davoue* v. *Fanning*, 2 *Johns. Ch.* 252; *Ex parte Wiggins*, 1 *Hill's Ch.* 353; *Farr* v. *Sims' Rich. Eq. Cas.* 138; *Huger* v. *Huger*, 9 *Rich. Eq.* 225, and cases there cited.

The only exception to this rule is made in behalf of the *bona fide* purchaser for full value without notice; and the next question is, whether the defendants, when they purchased from Pearson in possession and received title from Fair, who was the apparent owner, had notice of the private arrangement under which the purchase was made. So far as the pleadings are concerned, we think the defence is stated with sufficient fullness. The denial of notice, "directly or indirectly," includes a denial of notice by the agent. But if it had been otherwise, it is now too late to make the objection. It should have been made by notice to make the answer more definite, or by demurrer. *Pom.*, § 596.

There are two kinds of notice—actual and constructive. Childs alone conducted the negotiation for the purchase of the lot, and it is clear that he had no actual notice. He was not at the sale. There is no proof that any one informed him of the agreement, and he swears that he had no such notice. The inquiry is, then, narrowed down to the question whether Childs, in person or through his attorney, had constructive notice. If there are circumstances sufficient to put a party upon the inquiry, he is held to have notice of everything which that inquiry, properly conducted, would certainly disclose; but constructive notice goes no further. It stands upon the principle that the party is bound

X

to the exercise of due diligence, and is assumed to have the knowledge to which that diligence would lead him; but he is not held to have notice of matter which lies beyond the range of that inquiry and which that diligence might not disclose. "There must appear to be, in the nature of the case, such a connection between the facts disclosed and the further facts to be discovered, that the former could justly be viewed as furnishing a clue to the latter." *Birdsall* v. *Russell*, 29 *N. Y.* 220; *Cambridge Valley Bank* v. *Delano*, 48 *N. Y.* 326; *Le Neve* v. *Le Neve*, *White & Tudor*, *Part I.*, § 11, ¶ 161, *notes.*

It does not appear that Childs had any reason to doubt the title so as to be put upon the inquiry against the hidden equity. He had some notice about a disputed lien, but that was a different matter. We are unable to see that either Childs or his attorney had knowledge of such facts as should fix upon Childs constructive notice of *the private agreement at the time of the sale,* which was the isolated fact that caused the defect in the title. Baskin was employed to examine the title. He was in the commissioner's office with Pearson, and they had the books and papers before them, and Childs must be regarded as having had notice of all that they disclosed or upon examination would have disclosed to Baskin. We know of no facts thus within his reach other than these, viz.: That the lot was sold by Pearson, as commissioner, under an order of court, upon a credit of one, two and three years; that Fair purchased it and complied with the terms of sale; took title and executed bond and mortgage; that Pearson was in possession and controlling the lot in the name of his brother-in-law, who had title; that upon the receipt of the money and before due, he, as commissioner and payee, marked the bond and mortgage paid, and handed to Childs the deed of Fair. It may have been improper in Pearson to cancel the bond and mortgage before due. It concerned the discharge of his duty as commissioner, and might make him and his sureties liable on his official bond, or by possibility the act might be a nullity, leaving the mortgage a subsisting lien; but still that did not reach to the infirmity in the title which had vested. The only fact which could create that infirmity *was the private arrangement at the sale,* of which none of these circumstances, nor all of

them together, furnished knowledge. That fact was, in its nature, secret—out of the usual course of things—and not reasonably nor naturally inferable from what appeared. There is no proof that Pearson disclosed his secret, either to Baskin or Childs. There was no necessity for him to do so, and it does not appear that defendants had notice of it until Fair's answer to the original bill was filed. Looking back after that admission, it may be thought that there was enough to excite some general suspicions in a distrustful mind; but before the fact was disclosed by Fair, the circumstances were not, in our judgment, sufficient to lead up to this particular fact. It is said in the case of Birdsall *v.* Russell, before cited, that " the mere knowledge that the numbers on the bonds had been changed, gave the purchaser no clue, which, if followed up, would necessarily or even probably lead to knowledge."

It is said that Pearson was in possession, and that fact fixed Childs with all the equities of Pearson. That is true, but what equities had Pearson? The possession naturally implied only that Fair, the legal owner, allowed him to occupy it either as a tenant or as his friend and kinsman.

The plea of the defendants, Childs, Johnston and Willard, that they are *bona fide* purchasers for valuable consideration without notice, is sustained, and in that respect the Circuit decree is reversed. But as the plaintiffs may desire to set up the claim that the act of the commissioner in satisfying the mortgage before the debt was due, was a nullity, and that, therefore, they have a right now to demand a foreclosure of the mortgage, which was not considered by the court below, and could not, therefore, be considered here, and which the frame of the complaint, as it now stands, would not permit, the case is remanded to the Circuit Court, and the plaintiff may, if so advised, apply to that court for such amendment as may be necessary to effect that purpose. If within a reasonable time after notice of this judgment, no such application is made, then the Circuit Court is instructed to dismiss the complaint as to the defendants, Childs, Johnston and Willard.

McIver, A. J., concurred.